ble, at common law, for the said sum of 200 dollars. That the owners were in no manner bound for the same.

THE COURT adjudged accordingly, that the brig was liable to the amount agreed upon as monthly wages; with costs.

[NOTE. It was subsequently decided in the suit brought by the plaintiff against Manwaring to recover the $200 that the matter was a subject for common-law jurisdiction, and could not properly be brought in admiralty. Case No. 8,089.]

## Case No. 8,089.

### L'ARINA v. MANWARING.

### [Bee, 199.] 1

District Court, D. South Carolina. July, 1803.

ADMIRALTY — JURISDICTION — ACTION FOR SUM AGREED TO BE PAID ON DISCHARGE— SEAMEN'S WAGES.

An agreement by the captain of a vessel to pay wages is sueable in the admiralty. But another stipulation in the same contract to pay a sum of money, if the voyage should be altered or discontinued, must be enforced at common law.

[Cited in Plummer v. Webb, Case No. 11,233; Cox v. Murray, Id. 3,304; Grant v. Poillon, 20 How. (61 U. S.) 168; Peck v. Laughlin, Case No. 10,890.]

This is a suit for the recovery of 200 dollars, under an agreement entered into by defendant at the Havanna on the 1st of May last. The agreement consisted of two parts: 1st. To allow the actor monthly wages, at the rate of 50 dollars per month, and maintenance on board the brig Exchange, as well on board as on shore. 2d. That if the voyage should be changed, or the captain should not return to the Havanna, then to pay the actor 200 dollars over and above his said monthly pay.

Before BEE, District Judge.

Suit was brought against the brig about ten days ago, when the court determined that the vessel and owners were liable for the monthly wages agreed upon; and for no more. This decision could not impair the right of the actor against the captain, under the agreement. Manwaring was no party to that suit: and the jurisdiction of the court as to him was not considered.

It is now contended that Captain Manwaring is liable in this court under this contract. That the contract is entire and cannot be divided. That it must be maritime in toto, or the reverse. This point has already been decided; for the former decree made the vessel liable for monthly wages, and dismissed the suit (as to her and the owners) for the remaining sum stipulated for in the agreement. [Case No. 8,088.]

The next question is, whether Manwaring may be sued personally in this court on the latter part of his contract. The law as laid down in Hopk. Works, 140, "that where the original cause of action is exclusively of admiralty, or common law jurisdiction, all incidental matters shall follow," is clear enough; but it can only apply to the parties in the original suit, and not to persons then out of the view of the court. Such is the case now. The former suit was brought by the actor against the vessel and owners. The present is between the same actor and the captain of the vessel, whose act was declared by the court 'not binding on the owners as to the sum of 200 dollars, over and above wages. That decree also declared that the question now under discussion was partly of admiralty, and partly of common law, jurisdiction; in which case the latter shall be preferred. Indeed, the petition in this case states that a suit at common law has been instituted; but that, the actor being a transient person, the defendant means to give bail, for the purpose of delay: which induces the application to this court.

It was contended that this court has jurisdiction, because, though the contract was on land, it contemplated a voyage performed, or to be performed. This will hold so far as relates to the payment of monthly wages, as well on board as on shore, and until the actor shall be discharged. But the stipulation to pay 200 dollars over and above these wages is, expressly, in case no voyage should be performed, or contemplated. This is a strong distinction between the two parts of the agreement; the latter of which is a contract on land, and only cognizable by the court of common law. Bills of lading, policies of insurance, and bottomry bonds, where the vessel is not hypothecated agreeably to the marine law, are all sueable at common law only. Yet these contracts are all more or less connected with a voyage. They give a title to sue the owners or master, but do not make the vessel liable; as she is in the case of seamen's wages.

I have considered the case fully, and have no hesitation in saying that, if I should assume jurisdiction, a prohibition would lie; and as there is no court where it could be immediately obtained, I shall at once decree that this suit be dismissed with costs.

## Case No. 8,090.

### The LARK.

### [1 Gall. 55.] 1

Circuit Court, D. Massachusetts. May Term, 1812.

SHIPPING—PUBLIC REGULATIONS—COASTING ACT.

"Foreign voyage," in the 8th section of the coasting act, 18th February, 1793, c. 8 [1 Stat. 308], means a voyage intended to some place within the jurisdiction of a foreign country, or at least without the territorial waters of the United States.

[See The Atlantic, Case No. 621.]

·[Appeal from the district court of the United States for the district of Massachusetts.]

---

1 [Reported by Hon. Thomas Bee, District Judge.]

1 [Reported by John Gallison, Esq.]

This was an information against the sloop Lark and cargo, for an alleged violation of the laws of the United States.

G. Blake, for the United States.
S. Dexter, for claimant.

STORY, Circuit Justice. It is agreed by the parties, that the facts of the case are truly stated in the decree of the district court. By that decree it appears, that the sloop, being a vessel usually employed in Boston Bay in the transportation of ballast, and under bond as such, was about 1 o'clock, p. m., on the 23d July, 1808, found at anchor, near George's Island, in Boston Harbor, by an officer of the revenue cutter. On going on board, a quantity of flour was found lying in apparent disorder, and an anonymous paper was found in [Christ.] Courtney's trunk, containing directions to proceed and meet a certain vessel described in the paper, which would be seen with certain signals, sailing in a line between Plymouth and Cape-Ann light-houses, to which he was to deliver his cargo. The flour had been taken in at Goldsborough's wharf, at the northerly part of Boston, about 6 or 7 o'clock on the preceding evening. The Lark passed the fort between 9 and 10 o'clock in the forenoon of the 23d, by showing a signal, correspondent with an arrangement previously made with the officers commanding at the fort, to save the claimant the inconvenience of exhibiting his pass, whenever he passed the fort. On the 26th of July, 1808, the same revenue cutter, being in the bay, saw and spoke with a vessel, called the Reuben and Rachael, of Halifax, Nova Scotia, which had cleared from Boston for Halifax a few days before, and which answered the description of the vessel mentioned in the paper found in Courtney's possession.

The sloop and her cargo were seized, and are now libelled: 1. For departing from the port of Boston, without a clearance or permit, contrary to the 3d section of the act of January, 1808, c. 8, which allegation is very properly on the evidence abandoned, as the schooner was found within, and had not departed from, the port of Boston. 2. The vessel is libelled for proceeding on a foreign voyage, being a licensed vessel, without giving up her enrolment and license, and without being duly registered, "contrary to the law;" and the second allegation is founded on the 8th section of the coasting act, 18th February, 1793, c. 8. 2 Folwell's Laws, 168 [1 Stat. 308].

It is said by the counsel for the claimant, that to proceed on a foreign voyage within the act must mean a voyage to a foreign port or country, or at least out of the domestic waters of the United States; and not merely a sailing to meet another vessel within the territorial jurisdiction of the United States, and there delivering a cargo. On the other hand, the attorney for the United States contends, that "foreign voyage" is used in the act in contradistinction to domestic voyages in the coasting trade or in the fisheries, and that all other voyages are foreign. I am satisfied however, that the act means, by a foreign voyage, a voyage intended to some place within the limits or jurisdiction of a foreign country, or at least without the territorial jurisdiction of the United States. Upon the facts therefore there is no forfeiture. I would also observe that the libel is informal, and ought to have been amended, and I should have required it to have been done, before the United States should have had judgment, that the goods remain forfeited. There is no allegation of a breach against the form of the statute; "contrary to law" means no more, than "contrary to the common law."

As however I have no doubt of a fraudulent intent, I shall certify that there was reasonable cause of seizure. Decree affirmed.

---

## Case No. 8,091.

### LARKIN v. UNITED STATES.

[Hoff. Land Cas. 313.] [1]

District Court, N. D. California. Dec. Term, 1857.

MEXICAN LAND GRANTS—MISSION PROPERTY—GENUINENESS OF GRANT.

1. The bona fides of the grant produced is not sufficiently established by the evidence.

2. But if the grant be genuine, the claim must be rejected, on the ground that the governor had no power to grant in colonization, or sell for a money consideration, the orchards and like property of the missions.

[3. A Mexican land grant will not be allowed in the absence of all proof from the archives, of all evidence of possession under the Mexican government, of the payment of the consideration, and of all explanation from the Mexican governor as to the circumstances under which he made the grant.]

Claim for about fifteen acres of land [part of the orchard of Santa Clara] in Santa Clara county, rejected by the board, and appealed by the claimant [Thomas O. Larkin].

Thornton & Williams, for appellant.
P. Della Torre, U. S. Atty.

HOFFMAN, District Judge. The claim in this case is founded on the alleged grant to Castañeda, Arenas and Dias, the merits of which were considered in the case of Redman v. U. S. [Case No. 11,631]. The testimony in the two cases is nearly identical, except that in this the depositions of John Forster and José Matias Moreno have been taken. John Forster swears to the genuineness of Pio Pico's and Moreno's signatures. I do not understand it to be disputed that the documents were actually signed by them. The allegation on the part

1 [Reported by Numa Hubert, Esq., and here reprinted by permission.]